1

2

3

4

5

6

7

8               **IN THE UNITED STATES DISTRICT COURT**

9              **FOR THE EASTERN DISTRICT OF CALIFORNIA**

10

11   WESLEY FITE,                              CASE NO. CV F 04-6608 REC LJO

12                    Plaintiff,          **FINDINGS AND RECOMMENDATIONS ON
                                          SOCIAL SECURITY COMPLAINT**
13         vs.                            (Docs. 18, 20.)

14   JO ANNE B. BARNHART,
     Commissioner of Social Security,

15                    Defendant.

16   _____/

17                              **INTRODUCTION**

18         Plaintiff Wesley Fite ("plaintiff") seeks this Court's review of an administrative law judge's

19   ("ALJ's") decision that plaintiff is neither disabled nor entitled to disability insurance benefits and

20   Supplemental Security Income ("SSI") under Titles II and XVI of the Social Security Act ("Act"), 42

21   U.S.C. §§401-433 and 1381-1382c.  Based on review of the Administrative Record ("AR") and the

22   papers of plaintiff and defendant Jo Anne B. Barnhart, Commissioner of Social Security

23   ("Commissioner"), this Court RECOMMENDS to deny plaintiff's request to reverse the

24   Commissioner's denial of disability insurance benefits and SSI or to remand for further proceedings.

25                              **BACKGROUND**

26                          **Personal Background**

27         Plaintiff is age 41and has a high school education and past work experience as a die cutter.  (AR

28   21, 66, 71, 74.)

                                        1

**Administrative Proceedings**

On April 17, 2002, plaintiff protectively filed his applications for disability insurance benefits and SSI to claim disability since September 15, 1997 due to knee problems, depression, learning disability and low back pain. (AR 21, 24, 40, 47, 55, 65, 109, 344, 349.) With its July 16, 2002 Notice of Disapproved Claims, the Social Security Administration ("SSA") denied plaintiff's claims and determined that his condition was not severe enough to prevent him to work. (AR 40, 349.) On August 16, 2002, plaintiff filed his Request for Reconsideration to challenge denial of his claims. (AR 45.) With its October 16, 2002 Notice of Reconsideration, SSA denied plaintiff's claims and again determined his condition was not severe enough to prevent him to work. (AR 47, 355.)

On December 5, 2002, plaintiff filed his Request for Hearing by Administrative Law Judge to claim his medical condition prevents him to engage in substantial gainful activity. (AR 53.) After a July 7, 2003 hearing, the ALJ issued his December 22, 2003 decision to conclude plaintiff is not disabled under the Act "because he can perform medium level work including his past relevant work." (AR 21.)

On January 29, 2004, counsel was appointed for plaintiff. (AR 15.) On that same date, plaintiff filed with SSA's Appeals Council his Request for Review of Hearing Decision/Order to challenge the ALJ's December 22, 2003 decision. (AR 13.) After accepting additional evidence and a letter brief of plaintiff's counsel, the Appeals Counsel, on September 24, 2004, denied plaintiff's request for review to render the ALJ's December 22, 2003 decision as the Commissioner's final decision subject to this Court's review. (AR 5, 10, 360.)

**Medical History And Records Review**[1]

***Jerald Jarrett, M.D., Treating Orthopedist***

On February 26, 1998, plaintiff treated with orthopedist Jerald Jarrett, M.D. ("Dr. Jarrett"), and complained of knee difficulty with the left knee "much more severely involved." (AR 143.) Dr. Jarrett noted the absence of injury but "after working on his feet for ten years, he believes that his symptoms have developed because of this work related position, in which he had to stand on concrete." (AR 143.) Plaintiff complained that kneeling, squatting and inclines aggravated his knee. (AR 143.) Dr. Jarrett's

---

[1]    The Commissioner "submits that the ALJ provided a fair and accurate summary of the medical evidence."

1  examination revealed: (1) full range of motion of both knees without restriction; (2) ability to extend and

2  flex completely; (3) absence of effusion and chondromalacia of the patella in both knees; (4) absence

3  of tenderness in the right knee on palpation and stable ligaments; and (5) slightly tender left knee over

4  the medial joint line.  (AR 144.)  X-rays "were totally unremarkable showing no abnormality, with a

5  good healthy clear space bilaterally."  Dr. Jarrett "could find nothing in the patient's examination in the

6  right knee, however he does have some slight tenderness medially on the left knee."  (AR 144.)

7       Dr. Jarrett's plan was to treat plaintiff for two weeks with anti-inflammatories, and if they did

8  not decrease plaintiff's symptoms, "an injection will be placed in the knee."  (AR 144.)  Dr. Jarrett noted

9  that if an injection does not work appropriately, plaintiff would be a left knee arthroscopy candidate.

10  (AR 144.)  Dr. Jarrett opined:

11       I do not believe that the right knee needs to be treated and I do not believe that the patient
         will require modified work.  I believe that he will be able to return to a work capacity

12       very shortly.  His symptoms appear to be very mild and certainly are not disabling
         enough for the patient to be off work for the last four months. . . . I do not believe that

13       his objective findings match the subjective complaints, at this particular time.  I would
         expect that the patient will have considerable relief with the medication I have given him

14       and will very likely not need an injection.  (AR 144.)

15  Dr. Jarrett prescribed Voltaren XR 100 mg.  (AR 145.)

16       On March 12, 1998, plaintiff complained that Voltaren did not help and was injected in the left

17  knee.  (AR 142.)  Dr. Jarrett noted that plaintiff "reacted very unusually and abnormally" in that instead

18  of instant relief, plaintiff noted worsening of symptoms although plaintiff "had no evidence of any type

19  of reaction to his injection . . . and he should've had relief."  (AR 142.)  Dr. Jarrett cautioned that he

20  "must approach him in a somewhat guarded manner regarding his complaints of symptoms, etc."  (AR

21  142.)

22       On March 25, 1998, plaintiff reported that the injection "did not do him any good" and

23  complained of tenderness over the medial side of his left patella.  (AR 141.)  Dr. Jarrett noted apparent

24  left knee stability, slight patella chondromalacia and absence of joint line tenderness and effusion.  (AR

25  141.)  Dr. Jarrett opined that plaintiff's case was unusual.  (AR 141.)

26       An April 3, 1998 nuclear scan of plaintiff's left knee revealed "no evidence of skeletal

27  pathology."  (AR 140.)  On April 8, 1998, Dr. Jarrett concluded that plaintiff had minor chondromalacia

28  of the left patella with neither effusion, ligamentous instability nor particular point tenderness.  (AR

3

139.) Dr. Jarrett noted that knee alignment and patella excursion with alignment were throughout the entire range of knee motion and unremarkable.  (AR 139.)  Dr. Jarrett opined that "the subjective complaints do not match the objective findings or are even close and that if an MRI is negative, plaintiff "should be able to return to a working situation.  With the inability to relate the patient to any type of knee pathology, I believe that the patient should return to a working situation, without any restrictions." (AR 139.)

An April 14, 1998 left knee MRI was unremarkable and revealed intact collateral and cruciate ligaments, quadriceps and patellar tendons, a "scant amount" of joint fluid, and neither apparent articular cartilage defects nor meniscal tear.  (AR 137.)  On April 27, 1998, plaintiff's left knee had 1+ effusion with approximately 20 cc of fluid.  (AR 136.)  Dr. Jarrett characterized plaintiff as an arthroscopy candidate although Dr. Jarrett did not anticipate a major finding.  (AR 136.)

### Charles E. Wilhite, M.D., Treating Physician

On August 18, 1998, plaintiff saw Charles E. Wilhite, M.D. ("Dr. Wilhite"), for a second opinion regarding plaintiff's knee pain.  (AR 155.)  Plaintiff report to Dr. Wilhite that plaintiff did not recall a specific injury but noted increasing pain in his left knee and swelling at the end of the work day.  (AR 155.)  Plaintiff noted his continuing left knee problems with prolonged standing or walking, and including swelling and stabbing pain toward the medial aspect.  (AR 155.)  Plaintiff also complained of lesser right knee pain from favoring his left knee.  (AR 155.)

Dr. Wilhite's examination revealed plaintiff's: (1) normal gait, lower extremities alignment and patellar tracking; (2) absence of either localized swelling, joint effusion, significant crepitus on patellofemoral compression, increased laxity on attempted patellar subluxation, significant apprehension, or increased anterior or posterior stress laxity; (3) negative Lachman's, pivot-shift, Flick's and McMurray's examinations; and (4) mild tenderness over medial joint and medial and lateral facet of patella.  (AR 156.)  Dr. Wilhite's distal neurovascular examination was normal.  (AR 157.)  Dr. Wilhite commented that plaintiff's "examination is unremarkable except for subjective tenderness, mostly over the medial joint line" and recommended arthroscopic examination.  (AR 158.)  Dr. Wilhite concluded:

> With the patient's clinical examination, I do not find anything which would preclude him from returning to his full work activities.  His preclusions are primarily subjective pain upon prolonged standing. . . . In the absence of significant findings on arthroscopy, I feel

4

1    he would be able to return to his prior occupation as a die cutter.  (AR 158.)

2                    ***M. Robert Ching, M.D., Treating Orthopedist***

3         Plaintiff treated with orthopedist M. Robert Ching, M.D. ("Dr. Ching"), who performed

4    November 6, 1998 arthroscopic surgery on plaintiff's left knee.  (AR 200.)  On January 11, 1999,

5    plaintiff reported a fair amount of pain/catching under his knee cap.  (AR 217.)  Dr. Ching diagnosed

6    Grade III-IV chondromalacic changes, patellofemoral compartment with slow improvement in physical

7    therapy.  (AR 217.)  Dr. Ching recommended fitting for a Dynasplint, continued physical therapy and

8    vocational rehabilitation training and found plaintiff unable to lift more than 25 pounds and to kneel or

9    bend with his left lower extremity.  (AR 217.)

10        On February 2, 1999, Dr. Ching prescribed an splint pro glide for plaintiff's left knee

11   chondromalacia.  (AR 216.)  A February 5, 1999 physical therapist's note to Dr. Ching reflected that

12   plaintiff had gained strength and endurance, uses a bicycle and stair machine but complains of pain.  (AR

13   214.)  On February 8, 1999, Dr. Ching noted plaintiff's continuing moderate pain under his knee cap,

14   slight limp, and difficulty with stairs, kneeling and bending.  (AR 213.)  Dr. Ching assessed Grade III-IV

15   chondromalacic changes of patellofemoral compartment of left knee.  (AR 213.)  Dr. Ching noted that

16   plaintiff improved slowly in physical therapy, recommended four more weeks of physical therapy, and

17   concluded that plaintiff would be unable to return to his screen printer work and would need vocational

18   rehabilitation.  (AR 213.)  A March 5, 1999 physical therapist's note to Dr. Ching reflected that

19   plaintiff's progress had plateaued and that plaintiff experienced sharp pain in the medial aspect of the

20   knee along the patella's border to interfere with walking.  (AR 210.)  On March 8, 1999, Dr. Ching noted

21   plaintiff's continuing left knee pain and difficulty straightening it and with stairs.  (AR 207.)  Dr. Ching

22   diagnosed Grade III-IV chondromalacic changes of the patellofemoral compartment.  (AR 207.)  Dr.

23   Ching found plaintiff permanent and stationary with need of vocational rehabilitation but inability to

24   perform prolonged bending, squatting, climbing or kneeling.  (AR 207.)  On May 14, 1999, Dr. Ching

25   noted plaintiff's continuing left knee pain and discomfort and severe discomfort under left knee cap from

26   walking more than 5-10 minutes.  (AR 204.)  Dr. Ching observed plaintiff's mild antalgic gait.  (AR

27   204.)  Dr. Ching assessed Grade III-IV chondromalacic changes of the patellofemoral compartment with

28   continued patellar compression syndrome and flexion contracture.  (AR 204.)  Dr. Ching gave plaintiff

                                              5

Celebrex samples and found plaintiff unable to return to work and a candidate for vocational rehabilitation. (AR 204.) On May 28, 1999, Dr. Ching noted plaintiff's increasing severe left knee pain with swelling.  (AR 201.)  Dr. Ching assessed severe left patellar chondromalacia with 3 + grating/tenderness and discomfort. (AR 201.) Dr. Ching recommended a job sitting 70-90 percent and refilled plaintiff's Vicodin prescription.  (AR 201.)

### David B. Coward, M.D., Treating Orthopedist

Orthopedist David B. Coward, M.D. ("Dr. Coward"), evaluated plaintiff on July 28, 1999. (AR 178, 186.) Plaintiff reported that he did not have a specific injury to cause his left knee symptoms.  (AR 178, 186.)  Dr. Coward noted Dr. Ching's November 6, 1998 surgery to remove loose chondral fragments and findings of Grade III-IV chondromalacia changes of the patella and trochlear groove of the femur. (AR 179, 186.) Dr. Coward further noted that plaintiff tried a job rewinding electrical motors but was able to work only four days.  (AR 179, 186.)

Plaintiff's main complaint was "constant" pain about the parapatellar region, and plaintiff explained he avoids all bent knee activities, experiences regular popping, is able to walk or stand 15-20 minutes, is unable to ride a bike, hike, play sports or drive a clutch. (AR 179, 186.)  According to plaintiff, is right knee is "sore" from overuse due to the left knee injury. (AR 179, 186.) Dr. Coward's examination revealed plaintiff's cautious left knee movement with apparent pain, minimal crepitation, relatively central patellar tracking, modestly tender patella on palpation, moderate medial and lateral joint line tenderness, and absence of obvious knee effusion, focal point of tenderness, significant varus or valgus instability and posterior sag.  (AR 180, 187.)

Dr. Coward diagnosed left knee patellofemoral compression disorder.  (AR 180, 187.)  Dr. Coward concluded that plaintiff had "symptoms far beyond what are expected from the usual and typical patellofemoral disorder" and recommended plaintiff to exercise his quadriceps every one or two hours due to his poor rehabilitation.  (AR 180, 187.)  Dr. Coward surmised that plaintiff had significant patellofemoral pain to which he did not adapt well. (AR 180, 187.) Dr. Coward did not suggest surgery but rather formal physical therapy once a week for eight weeks and to work daily on rehabilitation.  (AR 180, 187.) Dr. Coward opined that plaintiff was unable to return to his prior job duties but was hopeful that "with good rehabilitation he will be able to return to his previous employment." (A181, 188.) Dr.

Coward pointed out that July 28, 1999 x-rays revealed relative left knee osteoporosis and absence of soft tissue abnormalities and obvious joint space narrowing.  (AR 180, 182, 188.)

On August 3, 1999, Dr. Coward opined that plaintiff is able to pursue a shop technician job to repair electrical motors, will improve with rehabilitation, and "should be able to return to his present employment." (AR 177.)  On August 25, 1999, Dr. Coward noted prolonged bent knee activities would be difficult long term and that "there is significant room for improvement." (AR 174.)  On August 27, 1999, Dr. Coward noted that jobs with kneeling, stooping and bending "may be difficult" for plaintiff. (AR 173.)  On September 23, 1999, Dr. Coward commented that plaintiff had no major change in his status although his knee extension and strength had improved.  (AR 171.)  Dr. Coward noted the patella was markedly tender to palpation about both medial and lateral facets and the absence of knee effusion and instability.  (AR 171.)  Dr. Coward continued his diagnosis of left knee patellofemoral compression disorder, recommended conservative care, and was optimistic that if plaintiff improved his quadriceps tone, he will have functional improvement.  (AR 171.)  Dr. Coward considered plaintiff temporarily totally disabled.  (AR 171.)

On November 4, 1999, Dr. Coward noted plaintiff's continuing knee pain and rehabilitation. (AR 169.)  Dr. Coward observed plaintiff's non-tender joint lines and absence of effusion.  (AR 169.) Dr. Coward again diagnosed left knee patellofemoral compression disorder and commented that plaintiff made slow improvement and remained temporarily totally disabled for two months with hopes of plaintiff's return to his job repairing small engines.  (AR 170.)  On December 16, 1999, Dr. Coward noted plaintiff's unchanged knee and continued pain.  (AR 167.)  X-rays revealed no obvious degenerative joint disease and good patellofemoral joint spaces bilaterally. (AR 167.)  Dr. Coward again diagnosed left knee patellofemoral compression disorder and recommended continued conservative care with focused rehabilitation program.  (AR 168.)  Dr. Coward opined that plaintiff was unable to return to his job repairing small engines, was able to stand/walk 10-15 minutes per working hours, and should not squat, kneel, crawl or climb stairs.  (AR 168.)

Dr. Coward re-evaluated plaintiff on January 11, 2000 and noted that plaintiff's right knee had mild symptoms with some pain in suprapatellar region.  (AR 162.)  According to Dr. Coward, plaintiff's left knee produces constant daily pain ranging from slight to severe and quite irritating.  (AR 162.)  Dr.

Coward observed that plaintiff experienced more knee problems after his surgery to reflect quadriceps weakness. (AR 162.) Dr. Coward's examination revealed grade II crepitation, patella tender to palpation, slight lateral and medial joint line tenderness, and the absence of significant varus or valgus instability and posterior sag. (AR 163.) Dr. Coward diagnosed left knee articular cartilage injury, patellofermoral joint and right knee patellofemoral compression disorder. (AR 163.) Dr. Coward opined that plaintiff "cannot return to his usual and customary occupation. He can perform other jobs." (AR 163.) Dr. Coward concluded that plaintiff: (1) should avoid squatting, kneeling and other bent knee activities; (2) is able to stand or walk up to 10-15 minutes each working hour; (3) is able to sit without limitation but should be allowed to stand hourly to prevent prolonged positioning stiffness; (4) is able to lift up to 20 pounds and carry up to 10 pounds occasionally; (5) should not crawl or climb ladders and should rarely climb stairs. (AR 163-164.) Dr. Coward recommended continuing conservative care, including quadriceps rehabilitation, and found that further surgery will have no predictable value. (AR 164.)

On February 17, 2000, Dr. Coward found that several sedentary jobs were acceptable for plaintiff. (AR 160.) On April 6, 2000, Dr. Coward noted plaintiff's pain about the medial compartment and superior aspect of the left patella. (AR 185.) Dr. Coward's examination revealed full range of motion, medial and lateral facet tenderness, and absence of knee effusion. (AR 185.) Dr. Coward diagnosed left knee patellofemoral compression disorder and recommended continued rehabilitation and avoidance of bent knee activities. (AR 185.) Dr. Coward's June 1, 2000 examination revealed slightly decreased quadriceps tone, pain on maneuver to test quadriceps strength, unchanged range of motion, tenderness on palpation to patella medial and lateral facets, minimally tender joint lines, and absence of knee effusion. (AR 184.) Dr. Coward diagnosed left knee patellofemoral compression disorder and recommended continued rehabilitation. (AR 184.) On November 2, 2000, plaintiff complained his left knee was much worse with difficulty to get up from a sitting position and severe pain for about ten minutes once a day. (AR 223.) Dr. Coward's examination revealed good quadriceps tone, patella tenderness to palpation at medial and lateral facets, and non-tender superior and inferior poles. (AR 223.) Updated x-rays revealed well preserved joint spaces with no obvious changes. (AR 223.) Dr. Coward diagnosed left knee patellofemoral compression disorder, recommended continued rehabilitation

1   for motion and strength, and gave plaintiff Vioxx samples.  (AR 223.)

2                    *J. Conrad Clifford, M.D., Qualified Othopaedic Evaluator*

3       Orthopaedist J. Conrad Clifford, M.D. ("Dr. Clifford"), conducted a May 1999 qualified medical

4   re-evaluation in connection with plaintiff's workers compensation case and prepared a July 20, 1999

5   report.  (AR 190.)  Plaintiff complained of left knee pain from walking, standing, squatting and driving

6   a stick shift and a dull ache to his right knee.  (AR 192.)  Dr. Clifford's examination revealed plaintiff's

7   left antalgic gait and ability to walk on heels and toes and to squat two-thirds with complaints of left

8   anterior knee pain.  (AR 193.)  Dr. Clifford noted plaintiff's 5+ and symmetric strength of back and

9   lower extremity musculature.  (AR 194.) Dr. Clifford's examination further revealed plaintiff's slightly

10  tender right prepatellar area and more left tenderness.  (AR 195.)  Quadriceps inhibition and patellar

11  apprehension tests were positive on the left side and negative on the right.  (AR 195.)  Plaintiff could

12  not accomplish a full squat.  (AR 195.)

13      Dr. Clifford diagnosed bilateral patella chondromalacia, right minimal and left moderate.  (AR

14  196.) Dr. Clifford gauged plaintiff's left knee complaints as slight/moderate and frequent and right knee

15  discomfort as slight and intermittent.  (AR 196.)  Dr. Clifford noted the left knee's persisting

16  patellofemoral crepitus and positive patellar apprehension sign.  (AR 196.)  Dr. Clifford concluded that

17  plaintiff's left knee precluded climbing, walking over uneven ground, squatting, kneeling, crouching,

18  crawling, pivoting and comparable activities.  (AR 197.)  Dr. Clifford further concluded that plaintiff's

19  right knee precluded repetitive squatting and kneeling.  (AR 197.)  Dr. Clifford recommended

20  consideration of patellar decompression or patellar realignment.  (AR 197.)

21      Dr. Clifford conducted an April 26, 2000 qualified medical re-evaluation and prepared a June

22  23, 2000 report.  (AR 225.) Dr. Clifford attributed plaintiff to indicate improvement with exercises but

23  continued back knee aching irritated with exercises.  (AR 226.)  Dr. Clifford characterized plaintiff's

24  right knee complaints as modest with standing too long and walking too much.  (AR 226.)  As to

25  plaintiff's left knee, Dr. Clifford noted aching, dull, deep aches with too much standing or walking but

26  ability to drive, shop and perform house work.  (AR 226.)  Dr. Clifford's examination revealed

27  plaintiff's left leg antalgic gait and ability to walk on toes and heels, to hop without difficulty, and to

28  squat two-thirds. (AR 227.) Dr. Clifford noted there was 5+ and symmetric strength of plaintiff's back

1   and lower extremity musculature.  (AR 228.)

2        Dr. Clifford's left knee examination revealed some synovial thickening, positive quadriceps

3   inhibition and patellar apprehension signs, good quadriceps and hamstrings strength, and absence of

4   effusion.   (AR 228.)   Dr. Clifford diagnosed left knee chondromalacia patella and right knee

5   patellofemoral syndrome with tracking syndrome. (AR 229.) Dr. Clifford assessed plaintiff had become

6   permanent and stationary with some improved function. (AR 230.) Dr. Clifford characterized plaintiff's

7   left knee complaints as slight/moderate and frequent and the right knee examination as "innocuous"

8   except for some patellar tenderness.  (AR 230.)  Dr. Clifford concluded plaintiff's left knee precluded

9   heavy lifting, climbing, walking over uneven ground, squatting, kneeling, crouching, crawling, pivoting

10  and comparable efforts. (AR 230.) Dr. Clifford concluded that plaintiff's right knee precluded repetitive

11  squatting and kneeling.  (AR 230.)  Dr. Clifford recommended resistive exercise treatment and opined

12  that plaintiff is "capable of persisting with vocational rehabilitation" and "that the work of gambling

13  cashier, telephone solicitation, surveillance system monitor person, and wire harness assembler would

14  be within his capabilities."  (AR 231.)

15       ***Arthur Brinckerhoff, M.D., Treating Physician***

16       Plaintiff treated with Arthur Brinckerhoff, M.D. ("Dr. Brinckerhoff"), and on October 10, 2001,

17  complained of back pain for which he as assessed a low risk of complications. (AR 243.) On November

18  29, 2001, plaintiff complained of depression for which he was assessed a low risk of complications. (AR

19  242.)  On January 10, 2002, plaintiff complained of sleep disturbed by pain and was assessed low risk

20  of complications from back pain and depression.  (AR 237.)  July 23, 2002 lumbosacral spine x-rays

21  were essentially normal except for small osteophytes involving the anterior L4 vertebral bodies.  (AR

22  332.)  With his September 19, 2002 letter, Dr. Brinckerhoff noted his "policy to not perform disability

23  evaluations on my own patients" and inability to opine as to plaintiff's disability claims. (AR 312.) On

24  November 14, 2002, plaintiff was assessed with back pain and depression with low risk of

25  complications.  (AR 317.)  On December 12, 2002, plaintiff complained of back pain and depression

26  and was assessed low risk of complications from them.  (AR 315, 331.)  On January 15, 2003, plaintiff

27  complained of back pain and was assessed with back pain and depression with low risk of complications.

28  (AR 316, 330.) In March 2003, plaintiff was assessed with hypertension with low risk of complications.

(AR 329.)  On June 24, 2003, plaintiff was assessed with depression and back pain with low risk of complications.  (AR 327.)

### Chico Intermediate Care Medical Center

On April 27, 2002, plaintiff treated at Chico Intermediate Care Medical Center, and notes state: "He was working yesterday and punctured his left hand with a chisel." (AR 306.)  Plaintiff's puncture wound was treated and he was "in no acute distress." (AR 306.)  On July 30, 2002, plaintiff complained of back pain during past three to four months and which increased in his left lower back and radiated to his left buttock.  (AR 304.)  Plaintiff claimed an originating back injury from a fall as a preteen.  (AR 304.)  Plaintiff claimed inability to tolerate the pain to prevent him to lie down to sleep.  (AR 304.)  Examination revealed tenderness over the left sciatic notch.  (AR 304.)  Plaintiff was assessed with chronic low back pain with left sciatica and no neuro deficits.  (AR 304.)  Plaintiff was prescribed Ativan to help with sleep and Darvocet for pain control.  (AR 305.)

### Steve Guse, M.D., Consultative Physician

Steve Guse, M.D. ("Dr. Guse"), conducted a June 1, 2002 comprehensive orthopedic evaluation of plaintiff and prepared a report.  (AR 244.)  Plaintiff's chief complaints were left knee pain and depression.  (AR 244.)  Plaintiff explained to Dr. Guse that he last worked in 1997, denied specific injury, but noted in August 1997, his left knee became painful and swollen.  (AR 244.)  Plaintiff reported continuing difficulty with sitting, standing, prolonged static positioning and knee bending activity.  (AR 245.)  Plaintiff noted that he was "fully independent" for daily living activities and able to perform housework.  (AR 245.)

Dr. Guse's examination revealed that plaintiff "does not appear to be in pain and moves easily without requiring assistance." (AR 245.)  Dr. Guse noted that plaintiff ambulates "without obvious pain or favoring of one leg." (AR 246.)  As to plaintiff's left knee, Dr. Guse found infrapatellar bursal hypertrophy, medial joint line tenderness, pain with flexion beyond comfortable range of motion, slight pain with valgus and varus stressing, and absence of erythema, effusion, swelling, patellar apprehension, and ligamentous instability.  (AR 247.)  Dr. Guse's right knee examination was "normal." (AR 247.)

Dr. Guse diagnosed degenerative arthritis of the patellofemoral compartment of plaintiff's left knee.  (AR 247.)  Dr. Guse explained that plaintiff has "advanced arthritis and pain with over exertion.

1  Although I do feel he has some pain and limitations regarding the knee, I certainly feel he would be

2  employable in the future." (AR 247.)  Dr. Guse concluded that plaintiff is able to: (1) stand/walk two

3  hours in an eight-hour workday with normal breaks; (2) sit eight hours in an eight-hour workday with

4  normal breaks; and (3) lift 25 pounds frequently and 50 pounds occasionally.  (AR 247.)  Dr. Guse

5  further concluded that plaintiff would require postural changes, may have difficulty climbing ladders,

6  would not have problems with postural changes such as bending at the waist, should avoid bending at

7  the knees, kneeling and crawling, and has no limitations on upper extremities use and that his mobility

8  is not significantly impaired.  (AR 247-248.)  Dr. Guse summarized that plaintiff has left knee

9  degenerative arthritis and despite limitations on being on his feet, "he certainly would be able to perform

10  job duties in a seated position or where upper extremity tasks were dominant." (AR 248.)

11  ### *Joanna T. Koulianos, Ph.D., Consultative Psychologist*

12  Psychologist Joanna T. Koulianos, Ph.D. ("Dr. Koulianos"), conducted a June 7, 2002

13  psychological consultation of plaintiff.  (AR 249.)  Plaintiff complained of memory problems and

14  improper brain functioning and indicated that he was in special education during grades 3-12 and that

15  he was a one-time student at San Jose State University. (AR 249.) Plaintiff reported frequent depressed

16  feelings and increased symptoms, including irritability, temper tantrums, decreased

17  attention/concentration, and moderate anhedonia. (AR 250.) Dr. Koulianos found that IQ testing placed

18  plaintiff in the borderline to low-average range of functioning.  (AR 251.)  Kr. Koulianos noted that

19  plaintiff displayed difficulty to execute tasks requiring attention/concentration.  (AR 251.)  Dr.

20  Koulianos assessed as impaired to borderline plaintiff's memory for verbal and nonverbal tasks.  (AR

21  251.)  Dr. Koulianos observed that plaintiff's ability to learn new information presented verbally is

22  significantly below that expected given his IQ outcomes.  (AR 251-252.)  Dr. Koulianos assessed "a

23  specific learning disability in the area of auditory processing."  (AR 252.)

24  Dr. Koulianos diagnosed Dysthymia, provisional, learning disability, not otherwise specified

25  (auditory processing), and borderline intellectual functioning.  (AR 252.) Dr. Koulianos concluded that

26  plaintiff should be able without significant difficulty to: (1) execute single and uncomplicated routine

27  one or two-step job instructions; (2) interact appropriately with peers, supervisors and coworkers for

28  basic interactions; (3) execute basic daily activity routines; and (4) manage transitions or minor job

1  stressors for entry level jobs.  (AR 252.)

2  ### *Physical Residual Functional Capacity Assessment*

3  Corazon C. David, M.D. ("Dr. David"), a non-examining physician, completed a June 26, 2002

4  Physical Residual Functional Capacity Assessment to conclude that plaintiff is able to: (1) lift/carry 50

5  pounds occasionally and 25 pounds frequently; (2) stand/walk at least two hours in an eight-hour

6  workday; (3) sit about six hours in an eight-hour workday; (4) push/pull subject to the lift/carry

7  limitations; (5) occasionally kneel, crouch, crawl and climb ramp/stairs; and (6) frequently balance and

8  stoop.  (AR 257-258.)  Dr. David found that plaintiff is unable to climb a ladder, rope or scaffold.  (AR

9  258.)  Dr. David's assessment was affirmed by non-examining physician Patricia O'Neill, M.D.  (AR

10  263, 314.)

11  ### *Psychiatric Review Technique And Mental Residual Functional Capacity Assessment*

12  E. Harrison, M.D. ("Dr. Harrison"), a non-examining physician, completed a July 16, 2002

13  Psychiatric Review Technique to note plaintiff's memory and borderline intellect impairments and

14  Dysthymia (AR 268, 270.) Dr. Harrison noted plaintiff's moderate restriction/difficulties of daily living

15  activities and maintaining social functioning and concentration, persistence or pace.  (AR 277.)

16  Dr. Harrison completed a July 16, 2002 Mental Residual Functional Capacity Assessment to

17  conclude that plaintiff is not significantly or moderately limited in aspects of understanding and memory,

18  sustained concentration and persistence, social interaction and adaptation.  (AR 281-282.)  Dr. Harrison

19  concluded that due to borderline intellect with auditory processing problems and depression, plaintiff

20  is limited to simple repetitive, one- or two-step tasks taught by visual demonstration and should have

21  little public interaction.  (AR 283.)

22  Psychiatrist A. Schrift, M.D., affirmed Dr. Harrison's assessment.  (AR 285.)

23  ### *Robert Egert, M.D., Treating Physician*

24  Plaintiff treated with Robert Egert, M.D. ("Dr. Egert"), for his back pain.  (AR 323.)  On

25  September 9, 2002, plaintiff complained that during the past five years, "his back pain has become a

26  more pressing problem" and awakens him "frequently."  (AR 323.)  Plaintiff claimed that the back pain

27  had bothered him for more than 20 years since he fell from a tree as a child.  (AR 323.)  Plaintiff further

28  claimed that he is limited to lifting 30 pounds, standing 10 minutes and sitting for short time periods and

13

1   has difficulty driving.  (AR 323.)  Dr. Egert noted that plaintiff had declined another doctor's

2   recommendation of physical therapy.  (AR 324.)  Dr. Egert's examination revealed diffuse tenderness

3   in the lumbar paraspinals and 5/5 strength in the lower extremities.  (AR 324.)  Dr. Egert assessed July

4   23, 2002 lumbar spine x-rays as "unremarkable."  (AR 325.)  Dr. Egert assessed chronic back and left

5   lower extremity radicular complaints, recommended an MRI to determine existence of significant disc

6   pathology, and absent such a finding, treatment of anti-inflammatories, muscle relaxants and physical

7   therapy.  (AR 325.)  Dr. Egert prescribed Soma and Vioxx 25 mg.  (AR 325.)

8       A September 13, 2002 MRI revealed multi-level degenerative disc disease, annular tears at L4-5

9   and L5-S1, good alignment of vertebral bodies, and the absence of disc herniation and nerve

10  compression.  (AR 326, 335.)  On September 23, 2002, plaintiff complained of lower extremity radicular

11  pain.  (AR 322.)  Dr. Egert scheduled an epidural block, which plaintiff underwent on September 30,

12  2002.  (AR 321, 322.)  On October 17, 2002, plaintiff stated the epidural block provided only three or

13  four days of "good relief."  (AR 320.)  Dr. Egert recommended a translumbar epidural block.  (AR 320.)

14              ***Doojin Kim, M.D., Consultative Orthopedist***

15      Doojin Kim, M.D. ("Dr. Kim"), an orthopedist, conducted a September 28, 2003 comprehensive

16  orthopedic evaluation for plaintiff.  (AR 129, 336.)  Plaintiff's chief complaints were left knee and low

17  back pain.  (AR 129, 336.)  Plaintiff's medical records were unavailable to Dr. Kim.  (AR 129, 336.)

18  Plaintiff told Dr. Kim that plaintiff gradually developed left knee pain over years working at a die

19  cutting/printing business.  (AR 129, 336.)  Plaintiff explained that prolonged sitting, standing, bending,

20  and movement of his knee worsen his pain, which medication improves.  (AR 129, 336.)  Dr. Kim noted

21  plaintiff's complaints of chronic low back pain, "which he and his mother state have been ongoing since

22  he was thrown in a bathroom at the age of 17" and which "gradually built over the years since age 17."

23  (AR 129, 336.)  Dr. Kim attributed plaintiff as indicating that plaintiff is able to only watch television.

24  (AR 130, 337.)

25      Dr. Kim observed:

26      The claimant was able to get out of the chair without difficulty.  He walked with a slight
        limp on the right side on the way to the examination room.  The claimant was able to get

27      on and off the examination table without difficulty.  The claimant did not have any
        difficulty lying supine, but getting up from the supine position he had to roll on his side

28      first before getting up.  The claimant was observed to walk back to the waiting room

                                            14

1  without significant left-sided limp.  (AR 130, 337.)

2  Dr. Kim continued: "The claimant walked tentatively with a slight right-sided limp at first, but upon

3  leaving the examination room was noted to have improvement in his limp.  Romberg is absent."  (AR

4  131, 338.)

5  Dr. Kim found neither significant lumbar paravertebral muscle spasms, point tenderness in the

6  paravertebral muscles in the lumbar area, crepitus or effusion in either knee, nor obvious deformities of

7  the knees.  (AR 132, 339.)  Dr. Kim noted plaintiff's normal bulk and tone and 5/5 strength.  Dr. Kim

8  diagnosed lumbago and chronic right knee pain.  (AR 132, 339.)  Dr. Kim assessed that plaintiff lacks

9  "many objective findings to support his claims of subjective low back pain and chronic right knee pain."

10  (AR 132.)  Dr. Kim concluded:

11  > Based upon today's examination, the claimant can be expected to stand and walk in an
   > eight-hour workday at least six hours.  The claimant has no restrictions with sitting.  The
12  > claimant does not need an assistive device.  The claimant could lift and carry 50 pounds
   > frequently and 100 pounds occasionally.  There are no postural limitations.  There are no
13  > manipulative limitations.  There are no relevant visual, communicative, or workplace
   > environmental limitations.  (AR 132.)

14

15  Dr. Kim completed a September 28, 2003 medical source statement to conclude that plaintiff's

16  impairment did not affect lifting/carrying, standing/walking, sitting and pushing/pulling.  (AR 340-341.)

17  Dr. Kim further noted that plaintiff could frequently climb, balance, kneel, crouch and crawl and placed

18  on plaintiff neither manipulative, visual/communicative nor environmental limitations.  (AR 341-342.)

19  With his November 11, 2003 letter, plaintiff challenges Dr. Kim's examination and report in that:

20  (1) plaintiff was not acted to perform activities such as lifting, bending, sitting or walking; (2) the knee

21  problem is "secondary" and "it was **not** the right knee, it is the left knee" (bold in original); (3) plaintiff

22  "was not thrown into the bathroom, but fell and hit my lower back on the toilet"; and (4) plaintiff takes

23  medication for his back, not his knee.  (AR 128.)

24  ***Medications***

25  Plaintiff's medications have included Zantec 300 mg, Effexor 50 mg and 75 mg, Hydroxyzine

26  10 mg, Lipitor 10 mg, Ranitidone 300 mg, and Norco 325 mg.  (AR 122, 124.)

27  / / /

28  / / /

1

**Post-ALJ Hearing Treatment**

2

***Maury Harwood, M.D., Consultative Orthopedist***

3    Plaintiff was referred to orthopedist Maury Harwood, M.D. ("Dr. Harwood"), for consultation

4 on his knees. (AR 379.)  On December 19, 2003, Dr. Harwood noted plaintiff had significant left knee

5 crepitus and popping and difficulties kneeling, sitting for prolonged periods, and with stairs.  (AR 379.)

6 Dr. Harwood's examination of plaintiff's left knee revealed 1+ to 2+ effusion, positive patellofemoral

7 crepitus, positive grind, and positive apprehension test.   (AR 379.)   Dr. Harwood's right knee

8 examination revealed mild patellofermoral crepitus, grind and apprehension.  (AR 379.)  According to

9 Dr. Harwood, x-rays of the knees revealed mild spurring of the tibia spines, well-aligned patellofemoral

10 joint, and no obvious joint space loss.  (AR 379.)  Dr. Harwood commented that "there is little that can

11 be done after he has had the arthroscopy."  (AR 380.)  Dr. Harwood recommended a left knee MRI to

12 better evaluate the articular cartilage on the back side of the patellofemoral joint.  (AR 380.)  As to

13 plaintiff's right knee, Dr. Harwood assessed plaintiff has early symptoms as his left knee.  (AR 380.)

14 In a December 19, 2003 letter, Dr. Harwood noted that plaintiff has "significant patellofemoral pain"

15 but uncertainty exists whether "it is consistent with the amount of arthritis he has behind his left knee."

16 (AR 381.)  Dr. Harwood recommended an MRI.  (AR 381.)

17    On January 1, 2004, Dr. Harwood assessed that plaintiff had right knee patellofermoral arthritis

18 consistent with the left knee.  (AR 378.) Dr. Harwood recommended to repeat left knee arthroscopy with

19 possible tibial tubercle.  (AR 378.)

20

***Imaging Report***

21    A January 8, 2004 imaging report revealed mild bulging of the disc material posteriorly at the

22 level of the intervertebral disc space of L5 and S1.  (AR 382.)  The report indicated that the imaging

23 study was otherwise normal.  (AR 382.)

24

***Stanford Hospital And Clinics***

25    Plaintiff treated at Stanford Hospital and Clinics for back pain management and was seen on

26 February 26, 2004 by Kim Kaplan, M.D. ("Dr. Kaplan") and Michael S. Leong, M.D. ("Dr. Leong"),

27 who prepared a report.  (AR 371.)  Plaintiff claimed lower back pain beginning 20 years prior when he

28 was pushed into a toilet stall as a child.  (AR 371.)  Plaintiff noted that his pain radiates down his back

16

into his left leg, worsens from standing or sitting for long periods, and is stabbing.  (AR 371, 372.) Plaintiff further noted that Norco helped with pain and sleep and that he lies down to relieve his pain. (AR 371, 372.)  According to plaintiff, he does not sleep for more than four hours and his sleep is restless.  (AR 374.)  Dr. Kaplan and Dr. Leong's examination revealed that plaintiff was not in acute distress, walked with a normal gait, and had normal range of motion for his upper and lower extremities and thoracic spine.  (AR 374, 375.)  Dr. Kaplan and Dr. Leong noted that plaintiff's lumbosacral spine examination was positive for triggerpoints located bilaterally in the paraspinous muscles in the lumbar region.  (AR 375.)

Dr. Kaplan and Dr. Leong assessed myofascial pain in the lumbar paraspinous region, facet arthropathy of the lumbar spine, sacroiliac joint dysfunction bilaterally, piriformis syndrome bilaterally, and diskogenic disease of the lower lumbar spine.  (AR 375.)  Dr. Kaplan and Kr. Leong discussed possible treatment options, endorsed physical therapy, and recommended Narco regimen with possibility to start methadone and to discontinue Narco and anti-imflammatories, including Vioxx and Bextra.  (AR 375,376, 377.)  An outpatient evaluation also recommended physical therapy.  (AR 368.)

In an April 30, 2004 letter, Ian Carroll, M.D. ("Dr. Carroll"), noted plaintiff experienced sacroiliac dysfunction and right shoulder impingement.  (AR 365.)  Recommendations included stretching and strengthening exercises, mobilization of the sacral joint, shoulder rehabilitation, and a day program to assist with coping strategies.  (AR 366.)

As of June 21, 2004, plaintiff had been started on methadone 5 mg and was recommended to continue it.  (AR 363, 364.)

**Plaintiff's Activities And Testimony**

***Plaintiff's Questionnaires And Statements***

Plaintiff completed an April 12, 2002 Disability Report Adult to indicate that he can read and write more than his name in English.  (AR 64.)  Plaintiff claimed that his ability to work is limited by standing, lifting and walking limitations, learning disability and depression and that he is unable to perform manual labor.  (AR 65.)  Plaintiff participated in special education.  (AR 71.)

Plaintiff completed a May 5, 2002 Daily Activities Questionnaire to note that on an average day, he does "little things around the house."  (AR 90.)  Plaintiff experiences sleep difficulty, including

waking off and on, but takes no sleep medication.  (AR 90.)  Plaintiff has no difficulties caring for his personal needs.  (AR 90.)  Plaintiff prepares toast and soup for himself and shops infrequently although he needs no assistance to shop.  (AR 91.)  Plaintiff dusts and vacuums without assistance.  (AR 91.)  Plaintiff watches television and DVDs and once a day without assistance leaves his home, at times driving.  (AR 92, 93.)  Plaintiff becomes nervous being around "a lot of people."  (AR 93.)  Plaintiff cares for his grandson and attends church once a week.  (AR 93.)  Plaintiff has difficulty to concentrate when there is noise or people talking and becomes mad and frustrated when he cannot accomplish something.  (AR 94.)  Plaintiff has difficulty with oral instructions.  (AR 94.)  Plaintiff is unable to work because of short-term memory loss and his knees prevent him to "walk and stand for very long."  (AR 94.)  Plaintiff was required "to leave a job [be]cause my knees were in such pain."  (AR 94.)

Plaintiff's wife completed a May 5, 2002 Daily Activities Questionnaire (Third Party Information) to note that on a typical day, plaintiff "does little things around the house, when he can." (AR 84.)  Plaintiff has no difficulty caring for his personal needs.  (AR 85.)  Plaintiff needs no assistance with meal preparation although his wife prepares meals.  (AR 85.)  Plaintiff performs some household cleaning for which he needs no help to complete.  (AR 86.)  Plaintiff goes outside his home each day without assistance.  (AR 86.)  Plaintiff has a driver's license, drives a car, and enjoys camping.  (AR 86.)  Plaintiff functions better in smaller, rather than larger, groups of people.  (AR 87.)  Plaintiff fears crowds.  (AR 89.)  Plaintiff provides child care and attends church.  (AR 87.)  Plaintiff is forgetful and stops more difficult tasks out of frustration.  (AR 88.)

Plaintiff completed an August 19, 2002 Reconsideration Disability Report to claim back trouble and pain and worsened depression.  (AR 109.)

In an undated statement, plaintiff noted he continued to experience low back and knee pain to hinder his mobility.  (AR 120.)

### *Plaintiff's ALJ Hearing Testimony*

Plaintiff testified at the July 7, 2003 ALJ hearing that he has knee cap cartilage problems, degenerative disc problems, short-term memory loss and severe depression.  (AR 387.)  Plaintiff's back pain is worsened from standing and walking and he lies down to relieve it.  (AR 388.)  Plaintiff experiences back pain from prolonged sitting and is able to sit up to 20 minutes without a break when

1   driving.  (AR 389, 392.)  Plaintiff's use of hands for a prolonged period causes back pain from "moving

2   around a lot."  (AR 390.)  Plaintiff no longer goes camping because of his condition.  (AR 392.)

3       Plaintiff experiences knee pain from walking, standing or sitting.  (AR 388, 390, 399.)  Plaintiff

4   avoids stairs because they cause him knee and back pain.  (AR 390.)  Plaintiff is limited to 20 minutes

5   of sitting and 7-10 minutes of standing.  (AR 399.)  Plaintiff estimates he is able to lift 5-10 pounds.

6   (AR 399.)

7       Plaintiff completed high school, received a high school diploma, and was in special education.

8   (AR 388.)  Plaintiff has a third or fourth grade reading and writing level.  (AR 388.)

9       Plaintiff has difficulty finishing things because he becomes board and walks away.  (AR 391.)

10  Plaintiff lacks attention span and forgets what he is told.  (AR 391, 393.)  Plaintiff has no problem being

11  punctual and reliable in a job situation.  (AR 391.)  Plaintiff is unable to assist with household chores

12  because of difficulty to stand.  (AR 391.)  Plaintiff does not do laundry because he does not separate the

13  clothes.  (AR 393.)  Plaintiff needs to lie down after vacuuming a small room.  (AR 391.)  Plaintiff does

14  not get along well in large groups, which make him nervous, although he attends church when he feels

15  well.  (AR 392.)  Plaintiff fears people in crowds will talk to him.  (AR 396.)  Plaintiff prefers one-on-

16  one conversations.  (AR 396.)  Most of the time, plaintiff feels people are paying him undue attention.

17  (AR 395.)  Plaintiff has no problem maintaining friendly relationships with family members.  (AR 396.)

18  Plaintiff watches over his preteen grandson when he comes home from school.  (AR 397.)

19      On a typical day, plaintiff lies on the couch because of his knee and back pain.  (AR 397.)

20  Plaintiff gets up "every once in a while" to use the bathroom or to let out the dogs.  (AR 398.)

21      Plaintiff feels pretty down and not active.  (AR 394.)  Plaintiff has thought "lots of times" of

22  taking his life but never has attempted suicide although he put a gun to his head, the number of times

23  of which he cannot recall.  (AR 394.)

24      Plaintiff's mental health care treatment is limited to anti-depressants prescribed by Dr.

25  Brinckerhoff because he cannot afford counseling.  (AR 395.)  Dr. Brinckerhoff prescribes plaintiff

26  Effexor.  (AR 395.)  Growing up, plaintiff saw a psychiatrist for three or four years and suffered from

27  dyslexia which he outgrew.  (AR 396.)

28      Plaintiff had problems with only one job which he had after knee surgery and could not stand or

sit long enough to perform the job.  (AR 394-395.)  Plaintiff quit that job and claimed that pain from sitting and standing would interfere with a future job.  (AR 395, 400.)

Plaintiff's mental problems do not prevent him to work because he "was working before."  (AR 400.)  Only physical problems prevent plaintiff to work.  (AR 400.)  Plaintiff could perform work if he was able to lie down but not if was required to sit and stand.  (AR 401.)  In April 2000, plaintiff punctured his hand using a chisel to remove a sharp piece of wood.  (AR 401.)

Plaintiff has no side effects from his medications.  (AR 398.)

### The ALJ's Findings

In his December 22, 2003 decision, the ALJ identified the specific issue as whether plaintiff is under a disability, which is defined as the inability to engage in substantial gainful activity due to a medically determinable physical or mental impairment that can be expected to result in death or that has lasted or can be expected to last for a continuous period of not less than 12 months.  (AR 20.)  The ALJ noted that since plaintiff was insured for disability benefits through December 31, 2002, he must establish disability on or prior to that date.  (AR 20.)  In concluding that plaintiff is not disabled, is able to perform medium level work, including his past relevant work, and is thus ineligible for disability insurance benefits or SSI (21, 30), the ALJ found:

1. Plaintiff has an impairment or combination of impairments considered severe but which do not meet or medically equal an impairment in the Listing of Impairments, 20 C.F.R. Part 404, Subpart P, Appendix 1 ("Listing of Impairments");

2. Plaintiff's allegations regarding his limitations are not totally credible;

3. Plaintiff has the residual functional capacity for medium work which does not involve crouching, crawling, kneeling, climbing, pivoting, squatting or walking on uneven ground;

4. Plaintiff's past relevant work as a die maker did not require performance of work-related activities precluded by his residual functional capacity; and

5. Plaintiff's impairments do not prevent him from performing his past relevant work.  (AR 29.)

/ / /

**DISCUSSION**

**Standard Of Review**

Congress has provided limited judicial review of a Commissioner's decision made through an ALJ. *See* 42 U.S.C. § 405(g). A court must uphold the Commissioner's decision, made through an ALJ, when the determination is not based on legal error and is supported by substantial evidence. *See Jones v. Heckler*, 760 F.2d 993, 995 (9th Cir. 1985); *Sanchez v. Secretary of Health & Human Services*, 812 F.2d 509, 510 (9th Cir. 1987) (two consulting physicians found applicant could perform light work contrary to treating physician's findings).[2] Substantial evidence is "more than a mere scintilla," *Richardson v. Perales*, 402 U.S. 389, 402, 91 S.Ct. 1420 (1971), but less than a preponderance, *Sorenson v. Weinberger*, 514 F.2d 1112, 1119, n. 10 (9th Cir. 1975). Substantial evidence "means such evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson*, 402 U.S. at 401, 91 S.Ct. 1420; *Sandgathe*, 108 F.3d at 980.

The record as a whole must be considered, weighing both the evidence that supports and detracts from the Commissioner's conclusion. *Sandgathe*, 108 F.3d at 980; *Jones*, 760 F.2d at 995. If there is substantial evidence to support the administrative finding, or if there is conflicting evidence that will support a finding of either disability or nondisability, the finding of the Commissioner is conclusive. *Sprague v. Bowen*, 812 F.2d 1226, 1229-1230 (9th Cir. 1987). If the evidence is susceptible to more than one rational interpretation, the court may not substitute its judgment for that of the Commissioner. *Tackett v. Apfel*, 180 F.3d 1094, 1097 (9th Cir. 1999); *Morgan v. Commissioner*, 169 F.3d 595, 599 (9th Cir. 1999).

This Court reviews the ALJ's decision pursuant to 42 U.S.C. § 405(g) to determine whether it is: (1) based on proper legal standards; and (2) supported by substantial evidence in the record as a whole. *Copeland v. Bowen*, 861 F.2d 536, 538 (9th Cir. 1988). "A decision of the ALJ will not be reversed for errors that are harmless." *Burch v. Barnhart*, 400 F.3d 676, 679 (9th Cir. 2005).

Plaintiff bears the burden to prove that he is disabled which requires presentation of "complete

---

[2] "The district court properly affirms the Commissioner's decision denying benefits if it is supported by substantial evidence and based on the application of correct legal standards." *Sandgathe v. Chater*, 108 F.3d 978, 980 (9th Cir. 1997).

and detailed objective medical reports of [his] condition from licensed medical professionals." *Meanel v. Apfel*, 172 F.3d 1111, 1113 (9th Cir. 1999) (citing 20 C.F.R. §§ 404.1512(a)-(b), 404.1513(d)). Plaintiff must furnish medical and other evidence about plaintiff's medical impairments. 20 C.F.R. §§ 404.1512(a), 416.912(a); ("[Y]ou must bring to our attention everything that shows that you are blind or disabled."); 20 C.F.R. §§ 404.1514, 416.914 ("We need specific medical evidence to determine whether you are disabled or blind.  You are responsible for providing that evidence.")

        Here, plaintiff claims disability since September 15, 1997 due to knee problems, depression, learning disability and low back pain.  (AR 21, 24, 40, 47, 55, 65, 109, 344, 349.)

        With these standards in mind, this Court turns to plaintiff's criticisms of the ALJ's December 22, 2003 decision.

### Mental Health Impairment

        Plaintiff argues that the ALJ failed to properly review the mental health evidence to find that plaintiff meets Listing 12.05 (mental retardation) of the Listing of Impairments.  The Commissioner responds that plaintiff fails to demonstrate he meets or equals the elements of Listing 12.05.

        SSA regulations provide: "If you do not have any impairment or combination of impairments which significantly limits your physical or mental ability to do basic work activities, we will find that you do not have a severe impairment and are, therefore, not disabled."  20 C.F.R. §§ 404.1520(c), 416.920(c).  "Basic work activities" are the "abilities and aptitudes necessary to do most jobs," including "walking, standing, sitting, lifting, pushing, pulling, reaching, carrying, or handling" as well as "[u]nderstanding, carrying out, and remembering simple instructions."  20 C.F.R. §§ 404.1521(b)(1), (3), 416.921(b)(1), (3).  At step two of the five-step disability analysis, "the ALJ must consider the combined effect of all of the claimant's impairments on [his] ability to function, and without regard to whether each alone was sufficiently severe."  *Smolen v. Chater*, 80 F.3d 1273, 1290 (9th Cir. 1996).  Such inquiry "is a de minimis screening device to dispose of groundless claims."  *Smolen*, 80 F.3d at 1290 (citing *Bowen v. Yuckert*, 482 U.S. 137, 153-154, 107 S.Ct. 2287, 2297-2298 (1987)).

        The purpose of the Listing of Impairments is to describe impairments "severe enough to prevent a person from doing any gainful activity."  *Sullivan v. Zebley*, 493 U.S. 521, 532, 110 S.Ct. 885 (quoting Social Security Ruling (SSR) 83-19, Dept. of Health and Human Services Rulings 90 (Jan. 1983)).  If

1  a claimant meets or equals a listed impairment, he/she is disabled. *Tackett*, 180 F.3d at 1099.

2      The United States Supreme Court has explained application of the Listing of Impairments:

3          The listings . . . are descriptions of various physical and mental illnesses and
   abnormalities, most of which are categorized by the body system they affect.  Each
4  impairment is defined in terms of several specific medical signs, symptoms, or laboratory
   test results.  For a claimant to show that his impairment matches a listing, it must meet
5  *all* of the specified medical criteria.  An impairment that manifests only some of those
   criteria, no matter how severely, does not qualify. . . .  "The level of severity in any
6  particular listing section is depicted by the *given set* of findings and not by the degree of
   severity of any single medical finding – no matter to what extent that finding may exceed
7  the listed value."

8          . . .

9

10         The [Commissioner] explicitly has set the medical criteria defining the listed
   impairments at a higher level of severity than the statutory standard.  The listings define impairments that would prevent an adult, regardless of his age, education, or work experience,
11 from performing *any* gainful activity, not just "substantial gainful activity."

12 *Sullivan*, 493 U.S. at 530-531, 110 S.Ct. 885 (italics in original; citations omitted).

13     "While the Listing of Impairments does describe conditions that are generally considered severe

14 enough to prevent a person from doing any gainful activity, an ALJ should not consider a claimant's

15 'impairment to be one listed in Appendix 1 solely because it has the diagnosis of a listed impairment.

16 It must also have the **findings** shown in the Listing of that impairment.'" *Young v. Sullivan*, 911 F.2d

17 180, 184 (9th Cir. 1990) (quoting 20 C.F.R. § 404.1525(d)); *Key v. Heckler*, 754 F.2d 1545, 1549-1550

18 (9th Cir. 1985)) (bold added).

19     Plaintiff bears the burden of proof to demonstrate that he has an impairment that meets of equals

20 one of the listed impairments. *Tackett*, 180 F.3d at 1098.  To "meet" a listed impairment, a claimant ust

21 establish that he or she meets each characteristic of a listed impairment relevant to his/her claim.

22 *Tackett*, 180 F.3d at 1099.  To "equal" a listed impairment, a claimant must establish symptoms, signs

23 and laboratory findings at least equal in severity and duration to the characteristics of a relevant listed

24 impairment. *Tackett*, 180 F.3d at 1099.  Medical equivalence must be based on medical findings in the

25 evidence supported by medically acceptable clinical and laboratory diagnostic techniques. *Tackett*, 180

26 F.3d at 1100; 20 C.F.R. §§ 404.1526(b) and 416.926(b).

27     As a matter of law, the ALJ need not "state why a claimant failed to satisfy every different

28

section of the listing of impairments," in particular when the ALJ's evaluation of the evidence is an adequate statement of the "foundations on which the ultimate factual conclusions are based." *Gonzalez v. Sullivan*, 914 F.2d 1197, 1201 (9th Cir. 1990). "An ALJ is not required to discuss the combined effects of a claimant's impairments or compare them to any listing in an equivalency determination, unless the claimant presents evidence in an effort to establish equivalence." *Burch*, 400 F.3d at 683; *see Lewis v. Apfel*, 236 F.3d 503, 514 (9th Cir. 2001).

In the case at hand, to meet Listing 12.05, plaintiff must satisfy diagnostic criteria: "If your impairment satisfies the diagnostic description in the introductory paragraph and any one of the four sets of criteria, we will find that your impairment meets the listing." 20 C.F.R., Subpt. P, App. 1 § 12.00A. Listing 12.05's opening paragraph provides: "Mental retardation refers to significantly subaverage general intellectual functioning with deficits in adaptive functioning initially manifested during the developmental period; *i.e.*, the evidence demonstrates or supports onset of the impairment before age 22." Neither plaintiff nor the evidence demonstrates significant adaptive functioning deficits prior to age 22. Moreover, as the ALJ noted, plaintiff had performed skilled work and considered vocations involving semi-skilled and skilled tasks. (AR 26.)

Plaintiff pays no heed to Listing 12.05's diagnostic criteria and supports his claim based on an IQ score "just 4 points from meeting Listing 12.05." Plaintiff fails to demonstrate that his condition equals section 12.05 in that he does not establish symptoms, signs and laboratory findings at least equal in severity and duration to the characteristics in Listing 12.05. "Although the presence of multiple impairments can on occasion support a finding that the impairments are equivalent to a listing, a finding of equivalence under Listing 12.05(C) will 'rarely be required.'" *Foster v. Halter*, 279 F.3d 348, 355 (6th Cir. 2001). Plaintiff fails to demonstrate that the ALJ erred as to meeting or equaling Listing 12.05.

Plaintiff also asserts that when considering the "myriad of orthopedic impairments . . . in combination, the Listing is equaled." Plaintiff fails to substantiate such assertion and his claim for further record development.

### Residual Functional Capacity Assessment

Plaintiff challenges the ALJ's finding that plaintiff has the residual functional capacity for medium work which does not involve crouching, crawling, kneeling, climbing, pivoting, squatting or

1   walking on uneven ground.  (AR 29.)  Plaintiff argues that the "multiple health restrictions generally

2   impact the world of work available to Plaintiff."  The Commissioner responds that the ALJ's residual

3   functional capacity assessment is supported by substantial evidence.

4   Residual functional capacity is "the maximum degree to which the individual retains the capacity

5   for sustained performance of the physical-mental requirement of jobs." *Reddick v. Chater*, 157 F.3d 715,

6   724 (9th Cir. 1998).  "When presented with conflicting medical opinions, the ALJ must determine

7   credibility and resolve the conflict." *Baston v. Commissioner of Social Security Admin.*, 359 F.3d 1190,

8   1195 (9th Cir. 2004).

9   Here, the ALJ thoroughly detailed and evaluated the medical evidence.  (AR 21-28).  The ALJ

10   was not required to match his residual functional capacity assessment with that of medical source in that

11   "final responsibility" to decide residual functional capacity "is reserved to the Commissioner."  20

12   C.F.R. §§ 404.1527(e)(2); 416.927(e)(2).  "It is clear that it is the responsibility of the ALJ, not the

13   claimant's physician, to determine residual functional capacity." *Vertigan v. Halter*, 260 F.3d 1044,

14   1049 (9th Cir. 2001).

15   Despite plaintiff's claims of disabling knee and back pain, the record's objective findings

16   (detailed above) are not severe.  The ALJ properly noted the absence of motor loss, reflex changes, or

17   neurological deficits.  (AR 25.)  As to plaintiff's left knee, treating orthopedist Dr. Jarrett noted full

18   range of motion, ability to extend and flex, absence of effusion, stable ligaments, "totally unremarkable"

19   x-rays, treatment with anti-inflammatories, ability to return to work, "very mild" symptoms, a nuclear

20   scan revealing "no evidence of skeletal pathology," unremarkable knee alignment and MRI, and absence

21   of effusion, ligamentous instability or particular point tenderness.  (AR 139, 140, 144.)  Treating

22   physician Dr. Wilhite noted plaintiff's normal gait, "unremarkable" examination, and absence of

23   localized swelling, joint effusion or preclusion to return to work.  (AR 157, 158.)  Treating orthopedist

24   Dr. Coward recommended conservative care with focused rehabilitation and exercise and return to work.

25   (AR 168, 169, 171, 177, 180, 181, 187, 188, 223.)  Dr. Coward noted full range of motion, available

26   sedentary jobs, x-rays revealing well preserved joint spaces, and absence of knee effusion.  (AR 184,

27   185, 223.)  Dr. Clifford noted plaintiff's ability to walk on heels and toes, improved function, and

28   absence of effusion.  (AR 193, 227, 228, 230.)  Dr. Guse's examination revealed that plaintiff "does not

appear to be in pain and moves easily without requiring assistance." (AR 245.)  Dr. Guse noted that

plaintiff ambulates "without obvious pain or favoring of one leg." (AR 246.)  Dr. Guse found absence

of erythema, effusion, swelling, patellar apprehension, and ligamentous instability. (AR 247.)  Dr. Guse

opined that plaintiff is employable. (AR 247.)  Dr. Kim noted plaintiff was able to get on and off the

examination table without difficulty and that plaintiff walked without a left-sided limp. (AR 130, 337.)

As to plaintiff's back, treating physician Dr. Brinckerhoff consistently noted low risk of

complications for plaintiff's back pain. (AR 237, 317, 315, 316, 327, 330, 331.)  Dr. Brinckerhoff noted

plaintiff's essentially normal lumbosacral spine x-rays. (AR 332.)  Dr. Brinckerhoff was unwilling to

opine as to plaintiff's disability claims. (AR 312.)  At the Chico Intermediate Care Medical Center,

plaintiff was noted to have tenderness over his left sciatic notch. (AR 304.)  Dr. Egert's examination

revealed diffuse tenderness in the lumbar paraspinals and 5/5 strength in the lower extremities. (AR

324.)  Dr. Egert found lumbar spine x-rays "unremarkable." (AR 325.)  Dr. Egert recommended

treatment of anti-inflammatories, muscle relaxants and physical therapy. (AR 325.)  An MRI revealed

absence of disc herniation and nerve compression. (AR 326, 335.)  Dr. Kim found neither significant

lumbar paravertebral muscle spasms nor point tenderness in the paravertebral muscles in the lumbar

area. (AR 132.)

Regarding plaintiff's mental health condition, the ALJ accurately noted plaintiff's "minimal

treatment," "essentially normal" clinical findings, and ability to perform daily living activities. (AR 26.)

Dr. Koulianos noted plaintiff's ability to: (1) execute single and uncomplicated routine one- or two-step

job instructions; (2) interact appropriately with peers, supervisors and coworkers for basic interactions;

(3) execute basic daily activity routines; and (4) manage transitions or minor job stressors for entry level

jobs. (AR 252.)  Plaintiff acknowledged that his mental health care treatment is limited to anti-

depressants prescribed by Dr. Brinckerhoff and that his mental problems do not prevent him to work.

(AR 395, 400.)

The ALJ acknowledged the differing views on plaintiff's residual functional capacity and

properly explained his rational to discredit certain of them:

> The undersigned rejects the standing and walking limitations assessed by Dr. Coward,
> Dr. Guse, Disability Determination Service sources, and the second assessment by Dr.
> Ching, because they are too extreme and not supported by the totality of the objective

evidence of record. For example, in December 1999, Dr. Coward found that the claimant could not stand or walk more than 10 to 15 minutes per hour. However, his clinical findings showed only mildly limited range of motion and joint tenderness, with no instability. Moreover, x-ray findings showed no degenerative joint disease and good joint space. Dr. Ching changed is functional assessment primarily due to the claimant's subjective complaints of increased pain, but these complaints are not fully credible, as will be shown below. Dr. Guse indicated that the claimant had a diagnosis of degenerative joint disease of the knees, but there is not x-ray evidence to substantiate this diagnosis.

A review of the whole record shows that the claimant had some fluid on the knee, and clinical findings of some joint tenderness. But strength, reflexes, sensation, and gait have remained intact. There is no evidence of instability. Thus, the limitations assessed by these sources are given less wight than those assessed by Dr. Wilhite, Dr. Clifford, and Dr. Kim because the record supports a finding that the claimant is not significantly limited in standing and walking. (AR 27.)

Plaintiff points to no meaningful error in the ALJ's evaluation of the differing views to reach the ALJ's residual functional capacity finding. The ALJ properly pointed to discrepancies in Dr. Coward's assessment and his treatment record. The ALJ was entitled to discredit treating physician opinions unsupported by the record as a whole or by objective medical findings. *Baston v. Commissioner of Social Security Admin.*, 359 F.3d 1190, 1195 (9th Cir. 2004). Inconsistencies and ambiguities in a treating physician's opinion regarding disability may constitute specific, legitimate reasons to reject the opinion. *Matney v. Sullivan*, 981 F.2d 1016, 1019 (9th Cir. 1992). The ALJ properly exercised his discretion to discredit Dr. Ching's assessment based on plaintiff's complaints of increased pain. An ALJ may reject a treating physician's report based on a claimant's exaggerated claims. *See, e.g., Sandgathe*, 108 F.3d at 980. A physician's opinion of disability "premised to a large extent upon claimant's own accounts of his symptoms and limitations" may be disregarded where those complaints have been "properly discounted." *Fair v. Bowen*, 885 F.2d 597, 605 (9th Cir. 1989) (citing *Brawner v. Sec. of Health & Human Servs.*, 839 F.2d 432, 433-434 (9th Cir. 1988)); *see Saelee v. Chater*, 94 F.3d 520, 522 (9th Cir. 1996), *cert. denied*, 519 U.S. 1113, 117 S.Ct. 953 (1997) ("no physician has been able to find a link between [claimant's] complaints and known medical pathologies"). The ALJ reviewed the evidence to mitigate his residual functional capacity finding to fulfill his duty to consider the entire record. *See Sandgathe*, 108 F.3d at 980. This Court is not in a position to undermine the ALJ's

///

///

1    resolution of the conflicts and ambiguities in the medical record.[3]

2                              **Plaintiff's Credibility**

3            Plaintiff challenges the ALJ's discredit of plaintiff's credibility and asserts that the ALJ failed

4    to adequately support rejection of plaintiff's credibility.  The Commissioner responds that the ALJ "cited

5    clear reasons for rejecting Plaintiff's subjective account of his limitations."

6            "Credibility determinations are the province of the ALJ."  *Fair*, 885 F.2d at 604; *Russell v.*

7    *Bowen*, 856 F.2d 81, 83 (9th Cir. 1988).  "An ALJ cannot be required to believe every allegation of

8    disabling pain."  *Fair*, 885 F.2d at 603. An ALJ "may disregard unsupported, self-serving statements."

9    *Flaten v. Secretary of Health & Human Services*, 44 F.3d 1453, 1464 (9th Cir. 1995).

10           A claimant bears an initial burden to "produce objective medical evidence of underlying

11   'impairment,' and must show that the impairment, or a combination of impairments, 'could reasonably

12   be expected to produce pain or other symptoms.'"  *Baston v. Commissioner of Social Security Admin.*,

13   359 F.3d 1190, 1196 (9th Cir. 2004) (quoting *Smolen v. Chater*, 80 F.3d 1273, 1281 (9th Cir. 1996)).  If

14   a claimant satisfies such initial burden and "if the ALJ's credibility analysis of the claimant's testimony

15   shows no malingering, then the ALJ may reject the claimant's testimony about severity of symptoms

16   with 'specific findings stating clear and convincing reasons for doing so.'"  *Baston*, 359 F.3d at 1196

17   (quoting *Smolen*, 80 F.3d at 1284).  "If the ALJ finds that the claimant's testimony as to the severity of

18   her pain and impairments is unreliable, the ALJ must make a credibility determination with findings

19   sufficiently specific to permit the court to conclude that the ALJ did not arbitrarily discredit claimant's

20   testimony."  *Thomas v. Barnhart*, 278 F.3d 947, 958 (9th Cir. 2002).

21           If an ALJ's credibility finding is supported by substantial evidence in the record, a reviewing

22   court may not engage in second-guessing.  *Thomas*, 278 F.3d at 959.  A reviewing court will not reverse

23   an ALJ's credibility determinations "based on contradictory or ambiguous evidence."  *Johnson v.*

24   *Shalala*, 60 F.3d 1428, 1434 (9th Cir. 1995) (citing *Allen v. Heckler*, 749 F.2d 577, 579 (9th Cir. 1984)).

25   "So long as the adjudicator makes specific findings that are supported by the record, the adjudicator may

26   discredit the claimant's allegations based on inconsistencies in the testimony or on relevant character

27

28           [3]      This Court notes plaintiff's objection to Dr. Kim's report and views the objection as grounds to discredit
     Dr. Kim's assessment.  This Court has weighed plaintiff's comments in its review of the ALJ's decision.

1   evidence." *Bunnell v. Sullivan*, 947 F.2d 341, 346 (9th Cir. 1991).  Moreover, "the ALJ is entitled to

2   draw inferences 'logically flowing from the evidence.'" *Macri v. Chater*, 93 F.3d 540, 544 (9th Cir.

3   1996) (quoting *Sample v. Schweiker*, 694 F.2d 639, 642 (9th Cir. 1982)).

4         In *Light v. Social Sec. Admin.*, 119 F.3d 789, 792 (9th Cir. 1997), the Ninth Circuit commented:

5   > In weighing a claimant's credibility, the ALJ may consider his reputation for truthfulness,
6   > inconsistencies either in his testimony or between his testimony and his conduct, his
    > daily activities, his work record, and testimony from physicians and third parties
    > concerning the nature, severity, and effect of the symptoms of which he complains.
7   > *Smolen*, 80 F.3d at 1284; *Moncada v. Chater*, 60 F.3d 521, 524 (9th Cir. 1995) (quoting
    > *Orteza v. Shalala*, 50 F.3d 748, 749-50 (9th Cir. 1995)); 20 C.F.R. § 404.1529(c).  An
8   > ALJ's finding that a claimant generally lacked credibility is permissible basis to reject
    > excess pain testimony.

9

10  *See also* S.S.R. 96-7p.[4]

11        An ALJ may consider the following factors to determine the credibility of a claimant's

12  allegations of disabling pain:

13      1.    The nature, location, onset, duration, frequency, radiation, and intensity of any pain;

14      2.    Precipitating and aggravating factors (e.g., movement, activity, environmental
15          conditions);

16      3.    Type, dosage, effectiveness, and adverse side-effects of pain medication;

17      4.    Treatment, other than medication, for pain relief;

18      5.    Functional restrictions;

19      6.    Claimant's daily activities;

20      7.    Unexplained, or inadequately explained, failure to seek treatment or to follow up a
21          prescribed course of treatment; and

22      8.    Ordinary techniques to test a claimant's credibility.

23  *Bunnell*, 947 F.2d at 346; *see* 20 C.F.R. §§ 404.1529, 416.929.

24  _____

25      [4]    Social Security Ruling 96-7p sets out factors to assess a claimant's credibility: (1)  claimant's daily
    activities; (2) location, duration, frequency, and intensity of the claimant's pain or other symptoms; (3) factors that precipitate
26  and aggravate the symptoms; (4) type, dosage, effectiveness, and side effects of any medication the claimant takes or has
    taken to alleviate pain or other symptoms; (5) treatment, other than medication, the claimant receives or has received for relief
27  of pain or other symptoms; (6) measures other than treatment the individual uses or has used to relieve pain or other
    symptoms (e.g., lying flat on his or her back, standing 15 to 20 minutes every hour, or sleeping on a board); and (7) any other
28  factors concerning the individual's functional limitations and restrictions due to pain or other symptoms.

After detailing plaintiff's medical treatment and testimony (AR 21-24), the ALJ thoroughly addressed plaintiff's credibility:

> . . . However, his allegations are not credible for the following reasons.  As explained above, the clinical findings in this case are minimal.  Although the claimant had arthroscopic surgery in 1998, records show good strength, motion, sensation, and reflexes.  The claimant's gait is generally normal, although Dr. Kim noted that the claimant's gait changed from the time he walked into the examining room to the time he left.  In addition, Dr. Egert noted positive Waddell's signs which suggest some amplification of his symptoms.  It is also noted that the claimant has received primarily conservative treatment for his knee since his surgery.  He underwent rehabilitation, but this resulted in improvement in function.  More recently the claimant reported back pain, but he did not want to undergo physical therapy and has been maintained on only medication.  He reported no side effects to medication.
>
> In addition to the limited treatment and medication, the claimant's activities of daily living have also been considered.  The claimant testified to performing very few activities.  However, the record documents that the claimant has been more functional than he alleged.  He has been able to do cooking, household chores, laundry, and child care duties.  He attended church, participated in rehabilitation, and occasionally drove (Exhibits 5E, 6E, 7F, 20F).  Thus, considering the claimant's course of treatment, medication, the clinical findings, and his activities of daily living, it is found that the record supports the conclusion that he can perform medium level work.  (AR 28.)

This Court is not in a position to second guess the ALJ's credibility evaluation in that the ALJ made sufficiently specific findings to substantiate that the ALJ did not arbitrarily discredit plaintiff.  The ALJ appropriately noted that the medical evidence fails to substantiate limitations to the degree to which plaintiff claims.  *See Rollins v. Massanari*, 261 F.3d 853, 857 (9th Cir. 2001) (objective medical evidence "is still a relevant factor in determining the severity of the claimant's pain and its disabling effects.")The ALJ provided specific findings and clear and convincing reasons to discredit plaintiff's claims.  The ALJ properly noted plaintiff's good strength, motion, sensation and reflexes despite his 1998 arthroscopic surgery.  Morever, plaintiff's post-surgery treatment was conservative.  *See Johnson v. Shalala*, 60 F.3d 1428, 1434 (9th Cir. 1995) ("conservative treatment" suggests "a lower level of both pain and functional limitation.")  To bolster his credibility evaluation, the ALJ pointed to Dr. Egert's notation of positive Waddell's signs as symptom amplification.

Plaintiff's treating physicians questioned his credibility.  Dr. Jarrett noted: "I do not believe that his objective findings match the subjective complaints."  (AR 139, 144.)  Dr. Jarrett was baffled by plaintiff's unusual and abnormal reaction to a left knee injection.  (AR 142.)  Dr. Jarrett found plaintiff in a position to return to work.  (AR 139.)  Dr. Wilhite found nothing to preclude plaintiff to work.  (AR

158.) Dr. Coward concluded that plaintiff had "symptoms far beyond what are expected from the usual and typical patellofemoral disorder." (AR 180, 187.) Dr. Coward opined that plaintiff could pursue an electrical motor repair job. (AR 177.) Dr. Coward found that several sedentary jobs were acceptable. (AR 160.) *See Moncada v. Chater*, 60 F.3d 521, 524 (9th Cir. 1995) (physician opinion that claimant could perform sedentary work is a specific reason to discredit excessive pain testimony). Dr. Brinckerhoff declined to opine as to plaintiff's claims. Dr. Guse surmised that plaintiff is employable. (AR 247.) Dr. Kim assessed that plaintiff lacks "many objective findings to support his claims of subjective low back pain." (AR 132.) The record is replete with notations to doubt the degree of limitations claimed by plaintiff. Further troubling is the surfacing of plaintiff's back complaints and treatment as his disability claims were processed and his inconsistent claim of fear of crowds and weekly church attendance. (AR 87, 89, 93, 392, 396.)

Substantial evidence supports the ALJ's specific findings on plaintiff's credibility to preclude this Court to second guess the ALJ. Plaintiff fails to demonstrate error in the ALJ's evaluation of plaintiff's credibility.

## CONCLUSION AND RECOMMENDATION

For the reasons discussed above, this Court finds no error in the ALJ's analysis and that the ALJ properly concluded plaintiff is not disabled. This Court further finds the ALJ's decision is supported by substantial evidence in the record as a whole and based on proper legal standards. Accordingly, this Court RECOMMENDS to:

1.    DENY plaintiff's request to reverse the Commissioner's decision to deny plaintiff disability insurance benefits and SSI or to remand for further proceedings; and

2.    DIRECT this Court's clerk to enter judgment in favor of defendant Jo Anne B. Barnhart, Commissioner of Social Security, and against plaintiff Wesley Fite and to close this action.

These findings and recommendations are submitted to the district judge assigned to this action, pursuant to 28 U.S.C. § 636(b)(1)(B) and this Court's Local Rule 72-304. No later than May 3, 2006, any party may file written objections to these findings and recommendations with the Court and serve a copy on all parties and the magistrate judge and otherwise in compliance with this Court's Local Rule

72-304(b).  Such a document should be captioned "Objections to Magistrate Judge's Findings and Recommendations."  Responses to objections shall be filed and served no later than May 12, 2006 and otherwise in compliance with this Court's Local Rule 72-304(d).  A copy of the responses shall be served on the magistrate judge.  The district judge will review the magistrate judge's findings and recommendations, pursuant to 28 U.S.C. § 636(b)(1)(C).  The parties are advised that failure to file objections within the specified time may waive the right to appeal the district judge's order. *Martinez v. Ylst*, 951 F.2d 1153 (9th Cir. 1991).

IT IS SO ORDERED.

**Dated:    April 17, 2006**                                  **/s/ Lawrence J. O'Neill**

66h44d                                                                UNITED STATES MAGISTRATE JUDGE